EASTERN DISTRICT OF NEW YORK
UNITED STATES DISTRICT COURT
------------------------------------------------------------------x

CHRISTOPHER DEFEO,

                            Plaintiff,         PLAINTIFF'S
                                                      MOTIONS <u>IN LIMINE</u> AND
                                                      MEMORANDUM OF LAW AND
                                                      FACT IN SUPPORT

                                                     No. 16 Civ. 5150

GUY LEIBSTEIN and B&E PRINTING
d/b/a ADCOMM DIGITAL,

                            Defendants.

------------------------------------------------------------------x

      This case arises from Plaintiff Christopher Defeo's false arrest, malicious prosecution, abuse of process and fabrication of evidence claims against Defendant Guy Leibstein and Corporate Defendant B&E Printing, Inc., d/b/a Adcomm Digital, brought under Section 1983 and New York state law. Plaintiff also brings a New York state defamation claim.

      Plaintiff makes the following motions <u>in limine</u> asking the Court to direct the Defendants, their witnesses and attorneys as follows during trial in order to avoid prejudicial error. Section A is a summary of Plaintiff's allegations, Section B is a brief procedural history, and Sections C onward contain Plaintiff's motions <u>in limine</u>.

      **A.**      **<u>Summary of Plaintiff's Allegations.</u>**

      Beginning in 2009 or 2010, Plaintiff Defeo began to work with Defendant Leibstein at Defendant D&B Printing, Inc., d/b/a Adcomm Digital, on printing and graphic are design work. When Defeo and Leibstein had a dispute in July 2015, this ended.

As Defeo and Leibstein went their separate ways, Leibstein demanded on or about July 24, 2015, that Defeo sign a non-compete agreement to limit his ability to do similar work going forward. See Lozar Decl., Exh. 1. Defeo declined to sign the proposed post-employment non-compete.

This angered Leibstein, who began to make false accusations against Defeo and threaten him that he would get the police involved. See Lozar Decl., Exh. 2. It was implied that if Defeo signed the non-compete agreement, Leibstein would not follow through on these wrongful threats. Among other things, Leibstein falsely accused Defeo of taking a $500 check from the Corporate Defendant without Leibstein's position, even though Leibstein had sent Defeo a text message on July 10, 2015, authorizing Defeo to do so. See Lozar Decl., Exh. 3. That authorizing text told Defeo—who had previously written and/or signed checks for the Corporate Defendant relating to payroll, accounts payable and other matters—to "take a $500 check for yourself you have been trying hard." Id.

Amidst all of this, Leibstein produced a document which he purported to be a May 2013 non-compete agreement that Defeo already signed. See Lozar Decl., Exh. 4. In effect, Leibstein's production of this document implied that Defeo's refusal to sign the proposed July 2015 post-employment non-compete was futile.

Defeo reacted to the alleged May 2013 document by stating that it was not his signature, and pointed out that if there was already a non-compete in place as Leibstein claimed, then Leibstein's unsuccessful demands that Defeo sign one in July 2015 were redundant. Defeo defended against this and Leibstein's various false accusations through then-Counsel Counsel Jason Canales and evidence while remaining steadfast in his refusal to sign the post-employment non-compete agreement proposed by Leibstein in July 2015. See, e.g., Lozar Decl., Exh. 5.

On July 30, 2015, Leibstein, who at the time knew about his July 10, 2015, authorizing text to Defeo, called 911 and falsely told responding officers that Defeo committed larceny against the company by stealing a $500 check. See Lozar Decl., Exh. 6.

Leibstein did not tell the officers responding to his 911 call about his July 10, 2015, authorizing text to Defeo. Even still, the responding officers did not arrest Defeo based on Leibstein's July 30, 2015, complaint because any case would require further development. Leibstein told the officers responding to his 911 call that Leibstein would "gather[] more info[rmation] . . . possibly to upgrade charges." Id.

In August 2015, Leibstein, who again at the time knew about his July 10, 2015, authorizing text to Defeo, called the police again and stated that he wanted to press what Leibstein knew was a false larceny charge relating to the $500.

Then, on August 28, 2015, Leibstein, who again at the time knew about his July 10, 2015, authorizing text to Defeo, went to a local precinct and commenced a criminal prosecution against Defeo based on the false charge by swearing out a complaint against him under penalty of perjury. See Lozar Decl., Exh. 7 (sworn complaint); see N.Y. C.P.L. § 100.30(1) (requiring a sworn complaint in support of charging instrument); People ex rel. Siegal v. Dros, 11 NY3d 167, 170 (1962) ("The requirement that a prosecution for misdemeanor be based upon a sworn statement is an essential guarantee to a defendant of a fundamental right, namely, that he be not punished for a crime without a formal and sufficient accusation."). In Leibstein's sworn complaint, he affirmatively stated the following, which he then submitted to be used for Defeo's arrest and prosecution:

- "Chris Defeo . . . did write out a business check #3514 in the amount of five hundred dollars without my permission to do so."

- "I want Christopher Defeo arrested for this."

- "I am the owner of Adcomm and I am the only person who writes business checks for my company."

Lozar Decl., Exh. 7. Leibstein said nothing about the authorizing text.

On September 22, 2015, police arrested Defeo on a larceny charge based exclusively on Leibstein's sworn and fabricated evidence. Over the course of the next fourteen months Defeo defended himself against the false charge, having to make nearly that many court appearances. See Lozar Decl., Exh. 8. Throughout the prosecution, Defeo argued through counsel that Leibstein had authorized him to take the $500 and presented the authorizing text. In fact, Defeo showed it to law enforcement on the date of his arrest because it was still there on his cell phone.

As time passed, prosecutors reached out to Leibstein to ask if he wanted to continue to press the charge. Leibstein affirmed that he did, causing the continuation of the proceeding.

Over the course of the prosecution, Defeo also sought to defend himself against the false charge by arguing that Leibstein had falsely sworn that he was the "only person who writes business checks for [Adcomm]." See Lozar Decl., Exh. 7. This was not true, but Leibstein's intent in so falsely stating had been to influence law enforcement to use state power to arrest and prosecute Defeo by presenting them with "facts" that they might not have otherwise found to provide compelling cause. In response to Defeo's argument that Leibstein's statement to this effect had been false, and that Chase bank records would show Leibstein's incredibility, Leibstein was asked to produce the Corporate Defendant's Chase bank records.

Leibstein never produced these material Chase records, despite his various affirmative actions to cause Defeo's arrest, to commence the prosecution against Defeo, and to continue the prosecution against Defeo as a purportedly sincere complainant.

In November 2016, the DA's office moved to dismiss Leibstein's charge against Defeo stating to the criminal court that its motion to dismiss was based on the record including Defeo's evidence and Leibstein's cellphone records. The criminal court granted the prosecutor's motion and dismissed the case under N.Y. C.P.L. Section 170.30(1)(f). See Lozar Decl., Exh. 9.

This litigation followed.

The Chase records which Leibstein never produced in the criminal prosecution were produced in civil discovery, and showed that Leibstein's sworn statement to law enforcement that he was the "only person who writes business checks" for Adcomm Digital was false, adding to the evidentiary problems that drove the favorable termination of Leibstein's false charge against Defeo. See Docket No. 77 (Plaintiff's Exhibits include the Chase records produced in response to FRCP 45 subpoena); id. (the Parties' stipulating to the Chase records' admissibility); Lozar Decl., Exh. 14 (letter and affidavit from Chase records custodian attesting to the company's FRCP 45 response's authenticity and creation of the records in ordinary course of business).

### B. Relevant Procedural History

Plaintiff filed his original complaint on September 15, 2016. Docket No. 1. In the ensuing two years, the Parties have heavily litigated the case, with discovery extended various times to allow for motion practice before Magistrate Judge Steven I. Locke.

On March 9, 2018, discovery closed. Docket Entry 2/21/2018.

During discovery, Defendants produced twenty-one (21) pages of discovery. Plaintiffs produced two-thousand-one-hundred-and-sixty-five (2,165) pages of discovery from his own files and the files of non-party record custodians.

On August 22, 2018, the Parties filed a JPTO in which Defendants noticed intent to use exhibits which, as described, were never produced in long-closed discovery. See Lozar Decl., Exh. 10 (copy of Docket No. 77). One example of the breadth of Defenadnts' "surprise" and unilateral reopening of discovery on the eve of trial is Proposed Exh. D1, which nonchalantly mentions Defendants' potential introduction of records sourced from *two years' worth* of heretofore-unproduced correspondence between the Parties—brought up for the first time in the JPTO two years after the litigation was filed and six months after the Court ordered discovery closed. See Lozar Decl., Exhibit 10 at 3, D1 (copy of JPTO filed at Docket No. 77).

### C. Defendants must be precluded from introducing evidence at trial that they did not produce over the course of the two years that this litigation has been ongoing, or in the six months since discovery closed.

In Defendants' JPTO exhibit list, they state their intention to use exhibits whose descriptions and content have heretofore been and remain undisclosed. These exhibits are labeled Exhibits D1, D2, D4, D5, D8, D9, D10 and D18 in Defendants' JPTO Exhibit list, and shockingly comprise nearly 50% of their proposed exhibits.[1] See Lozar Decl., Exh. 10 at 3-4 (copy of JPTO filed at Docket No. 77).

Federal law plainly and forcefully prohibits such attorney misconduct and various sources treat it as sanctionable. These sources include:

- Federal Rule of Civil Procedure 37(c)(1), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure is was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

- FRCP 37(b)(2)(A)(ii), which provides that "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders. They may include . . . prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence."

---

[1] Because Defendants have not followed the protocol that Defense Exhibits bear alphabetic identifiers, I will reference them as "D[#]" to distinguish them from Plaintiff's Exhibits.

It now being *two years* since Plaintiff filed his complaint and *six months* since the close of discovery, there is no conceivable justification for Defendants' attempt to suddenly convert the eve before trial into a unilateral reopening of discovery. It is only Defendants' "inattention to basic discovery obligations that is responsible." Richmond v. General Nutrition Ctrs., Inc., No. 08 Civ. 3577 (PAE) (HBP), 2012 WL 762307, at *5 (S.D.N.Y. Mar. 9, 2012).

It bears mentioning here what the Court already knows, which is that this is just the latest example of Defendants' misconduct in this regard. As early as this month, Defendants asked the Court to reopen discovery for limited records which they have known about since 2016—criminal court transcripts relating to the prosecution that is the subject of this litigation. Now Defendants do not even ask the Court for permission to reopen discovery – they simply announce their unilateral decision to dump new and voluminous discovery on Plaintiff and the Court in the middle of trial while witnesses are on the stand.

It is not just a technical misstep of which Plaintiff complains. The purpose of FRCP 16, FRCP 26 and FRCP 37 "is to avoid surprise or trial by ambush" and the procedural prejudice that would result. Am. Stock Exch. V. Mopex, Inc., 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (stating that FRCP 26(a), 26(e), and FRCP 37(c)(1), taken together, is to avoid trial surprise); see Lamborn v. Dittmer, 873 F.2d 522, 527 (2d Cir. 1989) ("Rule 16 . . . was intended to insure the efficient resolution of cases and, most importantly, minimize prejudicial surprise."). The significance of these fairness considerations is made even plainer by contemplated sanctions for such misconduct available under FRCP 16 and FRCP 37, which include but are not limited to:

- FRCP 16(f) authorizes the Court to sanction a party or attorney who "fails to obey" a scheduling deadline, including those sanctions available under FRCP 37(b)(2)(A)(ii)-(vii).

- FRCP 37(b)(2)(A)(ii) authorizes the Court to sanction a party by "prohibiting the disobedient party from supporting or opposing designated claims or defenses."

- The Court's own inherent authority.

Under the circumstances present here, it is axiomatic that Plaintiff would suffer prejudice if the Court were to permit Defendants to present heretofore-unproduced discovery at jury trial. Plaintiff has a right to conduct discovery himself relating to Defense theories and argument during discovery, and the Parties long ago performed and concluded discovery. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507 (1947). In effect, Defendants attempt to use extreme delay and surprise as tactical weapons, and the obviousness of this is highlighted by the breadth of the "new" discovery they seek to introduce as trial exhibits—again, and as noted supra, Defendants have announced that their Proposed Exhibit D1 encompasses *two years' worth* of un-produced emails between Defeo and Leibstein. This would strip Plaintiff of any semblance of fair opportunity to litigate those records' content. See Lozar Decl., Exh. 10 at 3 (copy of JPTO filed at Docket No. 77).

Similarly, Plaintiff asks that the Court issue an order precluding Defendants from achieving through witness testimony what Defendants should be prevented from springing with heretofore unproduced paper records. See Rojo v. Deutsche Bank, No. 06 Civ. 13574, 2009 WL 3790191 (SDNY Oct. 30, 2009) (precluding witnesses from testifying about information shown on unproduced and precluded documents, where testimony would prejudice the opposing party because the documents showed a witness's knowledge on points not covered in witness's deposition, and which adversary could not have known about absent full document production). In other words, Defendants should not be permitted to get in through witness testimony what they cannot sneak in through deliberately undisclosed documentary evidence, as Plaintiff has not been able to depose witnesses about those same matters.

In light of the foregoing, Plaintiff respectfully requests that the Court issue an in limine ruling precluding Defendants' Exhibits novel exhibits, revealed for the first time in Defendants' Proposed Exhibits D1, D2, D4, D5, D8, D9, D10 and D18 of the JPTO. See Lozar Decl., Exh. 10 at 3-4 (copy of JPTO at Docket No. 77).

### D. Defendants should be precluded from introducing evidence concerning Plaintiff's financial condition.

Plaintiff reasonably anticipates that Defendants will seek to introduce evidence concerning Plaintiff's finances, and argues that the Court should issue an in limine ruling excluding such evidence. In Defendants' Proposed Exhibit D5 (which again, is one of their novel, heretofore-unproduced exhibits), Defendants suggest that they intend to raise at trial that at some point Plaintiff was noticed that he underpaid his 2008 taxes. See Lozar Decl., Exh. 10 at 3 (copy of JPTO filed at Docket No. 77). This evidence is irrelevant to any of Plaintiff's claim elements or any of Defendants' pleaded defenses. Docket No. 30 at 2-3. Without any probative value, the subject would serve only to prejudice Plaintiff and confuse the jury, and Plaintiff asks that related evidence be precluded.

To be admissible under FRE 401 and 403, evidence must be both (1) relevant, and (2) not outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See U.S. v. White, 692 F.3d 235, 246 (2d Cir. 2012); see also U.S. v. Matera, 489 F.3d 115, 121 (2d Cir. 2007) ("The district court is commanded by Rule 403 to weight the probative value against the unfair prejudice."). The evidence here fails both tests.

As to relevance, the general legal rule is that evidence of a person's wealth, poverty, or specific indebtedness is inadmissible because it is prejudicial and not probative. See Edelbacher v. Galaza, No. 97 Civ. 5401, 2007 WL 677222, at *21 (C.D. Calif., Mar. 1, 2007) ("Evidence of a defendant's . . . indebtedness, without more, is inadmissible to establish motive for . . . theft because it is unfair to make poverty alone a ground of suspicion and the probative value of the evidence is deemed to be outweighed by the risk of prejudice."); People v. Heiss, 221 AD2d 562, 563 (2d Dep't 1995) (reversing larceny conviction because trial court allowed prejudicial evidence of judgment debt in evidence, which had no probative value, and stating that the judgment debts could not be characterized as bad or immoral acts or acts involving moral turpitude that would allow them to be used to question the defendant's credibility). An example of an exception to this general rule may be where someone accused of grand larceny is suddenly flush with cash after the alleged offense—for example, s/he begins sporting a huge new diamond ring just days after struggling to pay rent. I will call this the "diamond-ring exception." On this record—where the issue is Defeo's claim that Leibstein falsely and maliciously told authorities that Defeo stole $500 check without permission—the diamond-ring exception does not apply, and evidence of a 2008 tax debt is thus prejudicial to Plaintiff and not probative of any material issue in the case.

Furthermore, many lawsuits filed and litigated in this Court seek compensatory and other monetary damages, yet an analysis of a litigant's bank statements are not routinely admitted in evidence at trial to allege that a plaintiff has a bad faith motive to bring a claim without merit, or to allege that a defendant has a bad faith motive to oppose a claim with merit. In the context of

this particular litigation, Plaintiff's once-upon-a-time receipt of a modest back-tax notice should not be treated any differently than in those other contexts.

### E. Defendants should be precluded from using evidence of financial consequences for Defendants in the event of Plaintiff's Verdict

Defendants should be precluded from introducing evidence showing their financial means to pay should the jury find in Plaintiff's favor on claims. See Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 373 (2d Cir. 1988) (noting the often prejudicial effect of litigating a defendant's financial condition during trial on issues of liability and compensatory damages); In re Joint Eastern & Southern Dist. Asbestos Lit., No. 88 Civ. 4213 (RWS), 1990 WL 4772, at *5 (S.D.N.Y. Jan. 16, 1990) (noting that prejudicial effect of financial evidence avoided when not presented in liability case); Rupert v. Sellers, 48 A.D.2d 265, 272 (4th Dep't 1975) (noting impropriety of using a party's financial condition to induce jury on question relating to liability); Short v. 228 West Broadway, Inc., Index No. 162760/2014, 2015 WL 364688 (N.Y. Sup. Ct. June 4, 2015) (finding defendants' arguments regarding their insurance coverage and potential direct exposure if found liable to be "irrelevant"). Under FRE 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and is "of consequence in determining the action." Fed. R. Evid. 401. Under that standard, Defendants' finances are irrelevant to whether Plaintiff is able to prove elements material to liability on his claims, as outlined by Plaintiff in his proposed jury instructions submitted at Docket No. 78.

### F. Evidence of Plaintiff's marijuana-related arrest in or around 2008

Plaintiff reasonably anticipates that Defendants will attempt to introduce evidence of Plaintiff's marijuana-related arrest/conviction in California around August 2008 when he was in his twenties. At deposition, Defendants questioned Plaintiff regarding the matter.

Defendants should be precluded from introducing evidence relating to this subject to attack Plaintiff's character. Ten years have passed since the event, which triggers a presumption against admissibility under the Federal Rules of Evidence. Even if this were not true, the subject would only be admissible if Defendants could show that its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect. Stated differently, Plaintiff argues that the subject is inadmissible because the detrimental effects of its admission substantially outweigh its non-existent probative value. See Fed. R. Evid. 403, 609; U.S. v. Boulware, 384 F.3d 794, 808 N.6 (9th Cir. 2004) (stating that in instances where FRE 403 balancing did not occur, an appellate court must perform that balancing de novo).

Balancing under FRE 403 takes into account various factors bearing on probative value vs. prejudicial effect. These include (1) the impeachment value of the prior offense; (2) the remoteness of the prior offense; (3) the similarity of the past offense and the conduct at issue; and (4) the importance of the credibility of the witness. See Jean-Laurent v. Hennessy, 840 F. Supp. 2d 529, 544 (EDNY 2011). Here, all four of those FRE 403 balancing factors together show that the prejudicial effect of introducing Defeo's 2008 offense is much weightier than what Plaintiff contends is its non-existent probative value.

First, the impeachment value of the offense is little. Probative value may be shown if the prior offense bore upon "a dishonest act or false statement," but the Second Circuit has found that a marijuana offense does not involve dishonesty or a false statement. See U.S. v. Estrada, 430 F.3d 606, 616 n.3 (2d Cir. 2015) (stating that FRE 609(a)(2) was intended to cover only convictions "peculiarly probative of credibility"); Jimenez v. Lilley, 2017 WL 4535946, at *14 (SDNY Oct. 10, 2017) (finding marijuana use/sale conviction of "little, if any, probative value

for determining [the subject's] character for truthfulness," because the convictions demonstrate nothing about a propensity to lie).

The second factor—the remoteness of the 2008 offense—also weighs in favor of a finding that its introduction would be more prejudicial than probative. "Exclusion of proof of other acts that are too remote in time caters principally to the dual concerns for relevance and reliability." U.S. v. Larson, 112 F.3d 600, 604-05 (2d Cir. 1997).

As for the third factor, "[p]robative value is dependent on the existence of a 'close parallel'" between a fact issue and the prior act sought to be introduced. U.S. v. Corey, 566 F.2d 429, 431 (2d Cir. 1977). Under this standard, the probative effect of the marijuana event is non-existent, as there is no conceivable parallel—let alone a close one—between Leibstein's accusation that Defeo committed petty larceny in July 2015 and the marijuana offense in 2008. See U.S. v. Scot, 178 F.R.D. 49, 50 (D. Vt. 1998) (denying admission of three-year-old marijuana conviction in even a narcotics trafficking case because the narcotics trafficking case where the government sought to raise it did not involve marijuana).

Lastly, while any litigant's credibility is important to his/her case, in this action Defeo's claims do not stand or fall upon his credibility alone because there is ample corroborative documentary evidence. For example, Defeo's record contains the July 10, 2015, authorizing text, Chase records showing Leibstein's false statements about being the only check-writer for Corporate Defendant, and court transcript showing that the DA's Office eventually determined an inability to prove the charge on evidence available, including Leibstein's phone records. See, e.g., Lozar Decl., Exh. 3; Lozar Decl., Exh. 9. All of this and more firmly removes this case from being a pure swearing match between the Parties. Accordingly, this fourth factor weighs in

favor of the Court finding the 2008 marijuana matter as unduly prejudicial, not probative, and therefore inadmissible.

In light of the foregoing, Plaintiff asks the Court to direct Defendants, their witnesses and attorneys from seeking to introduce evidence at trial relating to the 2008 marijuana offense, as it only purpose would be to disparage and prejudice Plaintiff without any perceptible probative value.

### G. Evidence of settlement negotiations or offers of compromise should be precluded.

Reference to settlement negotiations or offers of settlement should be prohibited. FRE 408(a)(1) provides that settlement demands or offers to reach compromise regarding claims are not "admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach[.]" Fed. R. Evid. 408(a)(1). Similarly, FRE(a)(2) holds evidence of "conduct or a statement made during compromise negotiations" to be inadmissible in civil litigation. Fed. R. Evid. 408(a)(2). Accordingly, Plaintiff asks that the Court order the Parties to make no reference to settlement attempts and conduct or statements made pursuant thereto.

Relatedly, evidence of settlement negotiations is also inadmissible under FRE 402 (irrelevant) and under FRE 403 (confusing and prejudicial). Fed. R. Evid. 402, 403.

### H. Suffolk County Police Department, Suffolk County District Court, Suffolk County District Attorney Office, and Chase Bank Records Should Be Ruled Admissible Pursuant to the Parties' Stipulation

In discovery, Plaintiff requested and produced records from the Suffolk County Police Department, Suffolk County District Court, Suffolk County District Attorney's Office and JP Morgan Chase Bank through discovery requests and FRCP 45 subpoena, along with letters from respective

records custodians. See Lozar Decl, Exhs. 11-14 (records from the SC Police Department, SC District Court, DC District Attorney's Office, and Chase Bank records custodians regarding their respective productions). In the Parties' JPTO, the Parties stipulated to the admissibility of these records at trial. See Lozar Decl., Exh. 10 at 1 (copy of JPTO filed at Docket No. 77).

Accordingly, Plaintiff moves the Court to make an in limine ruling taking judicial notice of these records' admissibility without authentication and/or foundation testimony as the Parties' stipulation leaves no room for "principled dispute" relating to these questions. 3 Moore's Fed. Prac. § 16.77(4)(c); see Fed. R. Civ. P. 16(c)(2)(C) (stating that the purpose of pretrial proceedings is to permit the court to obtain "stipulations about facts and documents to avoid unnecessary proof, and ruling in advance on the admissibility of evidence"); FRCP 16, advisory committee note 1983; Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, at *691 (SDNY 2014) (finding that admissibility may be "predicated on judicial notice of the nature of the business and the nature of the records as observed by the court, particularly in the case of bank and similar statements"); Rojo v. Deutche Bank, No. 06 Civ. 13574 (HB), 2009 WL 3790191, at *4 (S.D.N.Y. Oct. 30, 2009) ("Since the only purpose for any testimony by a JP Morgan representative with respect to JMPC Documents will be to authenticate and/or to lay a business record foundation, the Court prefers that the parties enter into a stipulation as to these items to obviate the need for additional testimony."); Brager & Co., Inc. v. Leumi Sec. Corp., 530 F. Supp. 1361, 1364 (S.D.N.Y. 1982) (noting FRCP 16's benefits as including the obviation of trial authentication evidence through party stipulation); see also 3 Moore's Fed. Prac. § 16.77(4)(c) (Matthew Bender 3d ed.) (noting judicial economy achieved through stipulated admissibility of documents where there is "no principled dispute").

**I.    Defendants should be precluded from using evidence of Plaintiff's signature on myriad documents to attempt to establish a wholly irrelevant fact—whether Plaintiff signed a contested May 2013 non-compete agreement**

Plaintiff reasonably anticipates Defendants to seek to use various evidence (much of which is, again, comprised of heretofore-unproduced material) of exemplars of Plaintiff's signature for lay juror comparison for the purpose of showing that Plaintiff signed a non-compete with Defendants in May 2013. Plaintiff's expectation in this regard arises from the large amount of time spent at Plaintiff's deposition on the subject as well as the number of Defendants' proposed exhibits bearing on the subject. Defendants' intention in this regard raises a quintessential impermissible trial within a trial regarding who was right in the dispute that Plaintiff alleges was the backdrop motivating Defendants' bad acts against him.[2] See Ricketts v. City of Hartford, 74 F.3d 1397, 1414 (2d Cir. 1996) (holding that FRE 608(b) precludes the introduction of extrinsic evidence solely to attack credibility and affirming trial court decision that holding a "trial within a trial" concerning an ancillary matter "would have been more confusing than helpfully probative"); Redd v. N.Y.S. Div. of Parole, 923 F. Supp.2d 393, 401 (EDNY 2013) (holding that the court "will not permit a trial-within-a-trial" regarding who was right in dispute that formed the backdrop to the actual claims).

Briefly, and as discussed supra in Plaintiff's summary of allegations, the backdrop to Defeo's false arrest, malicious prosecution, abuse of process, evidence fabrication and defamation claims against Defendants includes the following facts:

(1) Leibstein became angry that Plaintiff would not sign a proposed post-employment non-compete agreement in July 2015. Lozar Decl., Exh. 1; id., Exh. 2.

---

[2] Indeed, the total irrelevance of Defendants' wish to show "who was right" in the dispute is made clearly if one were to assume arguendo that Defendants were right as to the fact or legal enforceability of the May 2013 agreement. What would be Defendants' argument then? That by virtue of Leibstein being right in the fight, that he had some sort of moral or legal authority to repeatedly lie to law enforcement that Defeo took the $500 without Leibstein's permission; that Leibstein was the "only person" who wrote Adcomm checks; and more?

    (2) In the face of Leibstein's subsequent threats and implications that he would accuse Plaintiff of criminal offenses if Plaintiff did not sign the proposed post-employment non-compete in July 2015, Plaintiff remained steadfast that he would not sign, and denied Leibstein's false accusations with then-Counsel Jason Canales and evidence. Exh. 2; Exh. 5.

    (3) Leibstein suddenly responded that Plaintiff's refusal to sign was in any event meaningless because, according to Leibstein, Plaintiff had signed a like May 2013 non-compete, which Defeo denied. Exh. 4.

Leibstein's claim about the alleged May 2013 document made little sense given Leibstein's demand that Plaintiff sign the proposed post-employment non-compete in July 2015. It was at this point that Leibstein, motivated by the Parties' disputes, began to actively instigate law enforcement authorities to arrest and prosecute Plaintiff on a false criminal charge which Leibstein knew at all relevant moments to be false, yet knowingly made anyway in order for retaliatory and collateral objectives.

    In light of the above, the authenticity of Plaintiff's signature on a May 2013 non-compete agreement is irrelevant to Plaintiff's claims or Defendants' defenses because it is the fact that Defeo and Leibstein had a dispute (not who was correct in the dispute) which is relevant to Leibstein's motive to make the false statements and material omissions for collateral and retaliatory objective. The answers to the questions that interest Leibstein so much—who was right?—have no tendency to make any fact consequential to the action "more or less probable than it would be without the evidence." Fed. R. Evid. 401. Plaintiff's claims are that Leibstein's rage over Defeo's legal and factual positions in their dispute motivated Leibstein's false criminal accusations against Defeo for collateral and retaliatory objectives.

    Furthermore, Defendants' evidence relating to who was legally/factually right in the dispute should be precluded because it requires the use of extrinsic evidence—by Defendants' own suggestion a panoply of Plaintiff handwriting exemplars which layperson jurors should pore over and compare against the May 2013 copy in order to perform technical handwriting analyses for which they have no

training. Generally, extrinsic evidence is held to be inadmissible on such collateral matters under FRCP 608(b). See <u>U.S. v. Shoreline Motors, Inc.</u>, 413 F. App'x 322, at *6 (2d Cir. 2011) (affirming trial court ruling precluding extrinsic evidence). In addition to the definitional impropriety of Defendants setting up a trial within the trial on an irrelevant issue, this particular one will be confusing to jurors and prejudicial to Plaintiff. Plaintiff asks the Court to order Defendants, their witnesses and attorneys that they may not mount their confusing, distracting and non-probative trial within this trial.

J.     **Mention of in limine rulings and excluded evidence should be precluded.**

The Court should not permit comments or suggestions the plaintiff has excluded from proof any matter bearing on the issues in this case. Various sanctions are available in the Court's discretion in response to govern a party's intentional violation of <u>in limine</u> rulings, and may include contempt, fines or mistrial. See <u>O'Buckley v. Cty of Chemung</u>, 149 A.D. 1232, 1233 (3d Dep't 2017) (affirming trial court's mistrial order after party violated court's previous order precluding certain evidence).

Dated:  August 23, 2018
        New York, New York

Respectfully submitted,

*/s/ Ryan Lozar*

Ryan Lozar, Esq.
Attorney for Plaintiff
305 Broadway, 14th Floor
New York, New York 10007
(310) 867-1562
ryanlozar@gmail.com

-18-